1

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

- - - - - - - - - - - x
                      :
UNITED STATES OF AMERICA   :
                      :
     -vs-             :     CASE NO. 1:11cr155
                      :
JAVIER SIVERONI,      :
                      :
          Defendant.  :
                      :
                      :
- - - - - - - - - - - x

                              Courtroom 700
                              U.S. District Courthouse
                              Alexandria, Virginia

                              Friday, November 4, 2011

          The above-entitled matter came on to be heard

before the HONORABLE LIAM O'GRADY, Judge, in and for the

United States District Court for the Eastern District of

Virginia, 401 Courthouse Square, Alexandria, Virginia,

beginning at 9:23 o'clock a.m.

     APPEARANCES:

          On Behalf of the United States:

               UZO ASONYE, ESQUIRE
               Assistant U.S. Attorney

          On Behalf of the Defendant:

               FREDERICK SINCLAIR, ESQUIRE

1                      P R O C E E D I N G S

2              THE CLERK:  Criminal Case Number 1:11cr155,

3      the United States of America versus Javier Siveroni.

4              THE COURT:  Has Mr. Yamamoto made it back in?

5              MR. SINCLAIR:  No, Your Honor, he's still with

6      Judge Trenga.

7              THE COURT:  Do you want to pass the case?

8              MR. SINCLAIR:  No.  I think I'm capable of

9      making our presentation to the Court.

10             THE COURT:  Well, I'm concerned, but I'll let

11     you go forward.

12             (Laughter)

13             MR. ASONYE:  Good morning, Your Honor.  Uzo

14     Asonye for the United States.

15             MR. SINCLAIR:  Your Honor, for the record,

16     Fred Sinclair.  Mr. Alan Yamamoto is next door with Judge

17     Trenga.  Present is Javier Siveroni (indicating).

18             THE COURT:  All right.  Good morning.

19             All right.  There are several guideline

20     calculation issues, the obstruction points -- two points

21     given Mr. Siveroni in relation to his contact with two of

22     the co-defendants, and then the role-in-the-offense

23     adjustment, not given, and (inaudible) abuse of position

1    of trust was imposed.

2              Does either party wish to be heard further on

3    that?

4              MR. SINCLAIR:  Your Honor, on the -- I think

5    our memorandum covered most of those issues, and I know

6    the Court reads them, so I'm not going to reiterate with

7    any depth.

8              However, I would point out that -- with the

9    obstruction of justice that, if Your Honor please, Mr.

10   Cherouny -- Mr. Leone, I mentioned -- I covered

11   everything, and he says that likely it was a call from

12   Mr. Siveroni -- his interview with the FBI -- to Leone

13   recounting what he -- that he had an interview with the

14   FBI.

15             And then there was this gratuitous statement

16   by Leone that "likely he told us to do something" -- not

17   most likely or highly likely, just likely.  And so I would

18   say, Your Honor, when you're considering the two-level

19   enhancement that adds substantial time to the individual

20   sentence, I would not take that with much weight -- give

21   it much weight.

22             Mr. Cherouny, Your Honor -- the one thing I

23   did notice that I didn't put in my memo -- he gave this

4

1   advice, according to Mr. Cherouny, after Cherouny asked

2   Mr. Siveroni why the FBI had contacted him, i.e. Cherouny.

3             At that time, at least from what I see in the

4   statement that Mr. Cherouny made, there was no indication

5   that the Government was investigating Mr. Siveroni at the

6   time.  They were coming in to talk to Cherouny, and he

7   advised Mr. Cherouny to deny in order to protect himself,

8   not to protect Mr. Siveroni.

9             So, it's not being done to induce him to cover

10   up for him; therefore, Your Honor, based on what I've

11   stated in the memorandum, I would ask the Court not to

12   impose the two-level enhancement with respect to

13   obstruction.

14             With respect to role in the offense, Your

15   Honor, as I submitted in the pleadings, we initially did

16   agree with the Government that they made the appropriate

17   enhancement.

18             However, subsequent to the plea, it did come

19   to mind two things.  There had been somewhat of an uneven

20   assessment of these adjustments.

21             With respect to Alquinta, it was imposed, and

22   perhaps with the other two, it wasn't because they did not

23   have secretaries.  But the probation officer saw fit to --

5

1   in her own mind -- to hold them all similarly accountable.

2          And then she looked at the two ladies, and

3   when she looked in depth at the role they played and the

4   number of people that they had themselves processed that

5   were family members, et cetera, it was the probation

6   officer's feeling that these two were sufficiently

7   independent, that they were not under the influence and

8   control of Mr. Siveroni.

9          Admittedly, at some point in time they had to

10  learn from Mr. Siveroni how to handle loan applications,

11  but considering the volume of what was done, I would find

12  it highly doubtful that they were sitting at his right

13  hand or right arm during the day and getting input from

14  him on a regular basis.

15          THE COURT:  Well, how long do they have to do

16  it before he qualifies?

17          MR. SINCLAIR:  Good question, Your Honor.  I

18  didn't read any kind of cases that said so many days or so

19  many minutes.

20          But, I mean, I realize this is a difficult

21  situation, because both of them worked for him in the

22  sense that he -- whatever they did, he paid their

23  salaries, he paid their commission.

1          But -- and that was one of the reasons that

2   initially we agreed with the Government that it might be

3   an appropriate -- that it could be an appropriate

4   enhancement.  But then the probation officer saw it

5   differently.

6          Once in a while we are certainly willing to

7   say we blundered and therefore are willing to adopt her

8   reasoning and, therefore, state that based on what the

9   probation officer felt, that perhaps it was not.

10          It was ill-advised on my part at the time to

11   agree to such an enhancement, and we address that in the

12   papers.

13          THE COURT:  All right.  Thank you.

14          Mr. Asonye?

15          MR. ASONYE:  Your Honor, the role adjustment

16   -- actually it was completely appropriate for the

17   Defendant to agree in a plea only to the two-point

18   enhancement because the Government had actually sought a

19   three-point enhancement, not only for Mr. Siveroni's role

20   in recruiting two relatives into the conspiracy, but his

21   role in assisting the three other loan officers by

22   providing them with blank leases that he knew would be

23   used to process fraudulent loan applications.

7

1    So, in exchange for the Government not seeking

2 that third -- the three-point enhancement, I think the

3 Defendant correctly agreed that it was appropriate to have

4 the two-point enhancement.

5    I don't think there's any question here that

6 Mr. Siveroni taught these loan assistants how to process

7 these fraudulent loan applications.  At some point they

8 did learn how to do them on their own, but he was very

9 much aware of what they were doing, and the Government

10 doesn't see any reason not to apply the two points in this

11 case.

12    On the obstruction issue, Your Honor, Mr.

13 Siveroni was one of the first -- was the first target of

14 this case, and he was advised early on that he was a

15 target of this case.

16    Yet, what we see as a consistent pattern, Mr.

17 Siveroni attempted to influence potential witnesses in

18 this case -- to the FBI -- but also as Sun Trust

19 investigated the case.

20    The enhancement is based on Mr. Siveroni's

21 advice to Mr. Cherouny that he deny all knowledge to the

22 FBI of anything he was asked and his statement to Mr.

23 Leone essentially of the same sort.

8

1          But Mr. Siveroni also told Mr. Leone, I

2    believe -- or Mr. Alquinta, when he was first interviewed

3    by Sun Trust -- that he should, quote, "deny, deny, deny"

4    when he spoke with investigators.

5          That's the pattern of this Defendant.  When

6    people started to investigate his conduct and the conduct

7    of other people at that office, he told them that they

8    should deny what happened even though they all knew that

9    they were processing fraudulent loan applications.

10          And the proximity in which -- Mr. Siveroni

11    knew that his conduct would hinder the investigation

12    because he knew that these individuals were meeting with

13    FBI agents the following day.

14          So, there's no question that he meant to

15    obstruct the investigation, and it did obstruct the

16    investigation because it caused us to take another year to

17    investigate this case before we were able to indict Mr.

18    Siveroni.

19          So, in our view, there's a clear obstruction-

20    of-justice-enhancement here.  And Mr. Siveroni knew

21    exactly what he was doing.  He was trying to obstruct the

22    investigation, and I believe the application of this

23    enhancement is appropriate in this case.

9

1           THE COURT:  Okay.  Well, they're both close

2    calls.  The role in the offense -- I did find that Mr.

3    Alquinta was deserving of two points, and I think that Mr.

4    Siveroni is as well.  He supervised Ms. Sanchez and Ms.

5    Camacho, hiring one of them and paying her, and then after

6    Mr. Alquinta paid Ms. Camacho -- hired Ms. Camacho, he

7    paid her.

8           But also he clearly in the beginning taught

9    them how to falsify documents and create fictitious

10   documents in support of these loans.  Then, of course, the

11   loans were approved through him; and that's sufficient, I

12   believe, to find under the guideline guidance that merits

13   the two points.

14          The obstruction -- I'm not going to give the

15   obstruction points.  I think that it's a fine line between

16   "Let's not cooperate with the Government and let's make

17   them prove the case against us" versus affirmatively

18   obstructing the investigation.

19          This is a very close case, but I do not think

20   that merely encouraging somebody not to cooperate and to

21   let them instead -- the Government -- prove the case,

22   without affirmatively obstructing the investigation

23   through either destroying documents or making up a

10

1   completely different story or leading the Government down

2   another path.  I think there's a distinction there.

3              So, the bottom line is that the guideline

4   range will remain the same at sixty-three to seventy-eight

5   months.  After Mr. Siveroni receives a full three points

6   for acceptance, he's left at an offense level total of

7   twenty-six.  He has no prior record.

8              And I've read the parties' positions on

9   sentencing, and I've read the many letters that were sent

10  in support of Mr. Siveroni.

11             Mr. Asonye, I'll hear anything you'd like to

12  say about sentencing at this time.

13             MR. ASONYE:  Yes, Your Honor.  I'll rest on my

14  papers, but I do believe that the parties have a joint

15  sentencing recommendation for the Court.

16             We believe that a term of incarceration of

17  thirty-six months would be appropriate in this case.  It

18  would reflect what the Court has ruled, how the Court has

19  sentenced the other defendants here.

20             It reflects the fact that Mr. Siveroni did

21  process the most fraudulent loan applications.  It

22  reflects the fact that he did not cooperate with this

23  investigation.  I discussed this with his attorney, and I

11

1   think we're on board with a thirty-six-month

2   recommendation, Your Honor.

3                THE COURT:  How does that fit with the

4   sentences of the other -- Mr. Alquinta, who I think I gave

5   twelve months and a day --

6                MR. ASONYE:  Right.  Mr. Alquinta was a

7   loan officer.  He processed fourteen fraudulent loan

8   applications, and his loss amount was approximately

9   $600,000.

10               His guidelines range was thirty-three to

11  forty-one months.  He received a 5K at fifty percent of

12  his sentence, but the Government requested a sentence of

13  seventeen months, and the Court sentenced him to twelve

14  months and one day.

15               THE COURT:  All right.  That's right; he

16  received a 5K1.  I had forgotten that.  All right.  Thank

17  you.

18               MR. SINCLAIR:  If Your Honor please, it's

19  always difficult -- I'll rest on my pleadings as far as

20  everything else, but it's always difficult to assess what

21  time an individual should serve.

22               Initially, as you know, when this matter came

23  before you, before meeting with the probation officer and

12

1   before you considered the pleas, he could have faced up to

2   seventy-eight to ninety-seven months.

3          As you've said, it's a close call with respect

4   to the obstruction.  And I had no idea, of course, how the

5   Court would rule today.  Nonetheless, he's still looking

6   at a range of sixty-three to seventy-eight.

7          I think the probation officer assessed it

8   correctly in the sense that she holds them all sort of as

9   line officers.  She doesn't make anybody the leader, the

10  mover and shaker as far as the loan officers.  There is,

11  of course, a difference among all four of them.  I'm

12  trying to prevent disparity here, and I refer the Court

13  to that in the memorandum.

14         And so, of course, I go back to Alquinta

15  because Mr. Alquinta was similar in losses.  Now,

16  obviously he came in early, and he got the benefit of

17  doing that.  The Government, in all due respect, capped

18  the losses to $400,000 to a million.  I dare say that

19  perhaps if we revisited his loans today that the number

20  could be substantially different.

21         I also mention to the Court how I calculated

22  or looked at his losses.  You have the women working for

23  him, so there's an additional $900,000 or so based on

13

1    their endeavors that raised his number.

2              And then I also mention to Your Honor there

3    was a confluence of events.  These loans that were made

4    that were based on fraudulent representations, we're still

5    paying for at least a year and a half or so.

6              Many bad loans go south within a few months,

7    but then there was the confluence of the market peaking in

8    '07, and then, as the Court is well aware, the massive

9    failure in 2008 of all the financial markets.

10             At that time these people all walked away from

11   those loans.  Whether or not they would have continued to

12   pay, who knows.  But, nonetheless, they're in default now

13   and the banks have foreclosed on them.

14             When I ask the Court to compare him to

15   Alquinta, I'm mindful that Alquinta's original guidelines,

16   Your Honor, were thirty-three to forty-one months and that

17   the thirty-six months put him somewhere within that range

18   with Alquinta because he was more productive.

19             And that's why we have that suggested

20   sentence.  The Court, of course, is free, unfortunately,

21   to go above it -- or it could go below it.

22             I'm also mindful, Your Honor, of Leone and

23   Cherouny.  Mr. Leone was twelve to eighteen, and Mr.

14

1   Cherouny was fifteen to twenty-one.  I don't believe that

2   there was a motion to reduce them, and they went down

3   (inaudible) to sixty days of incarceration and four months

4   on detention.

5           Nonetheless, those two officers had

6   substantially less losses, and they didn't get adjustments

7   for role in the offense.  So, again, there's some

8   disparity there only because their roles were different.

9           So, weighing all of that and looking at the

10  potential downside of these much higher numbers, it was my

11  opinion that perhaps thirty-six would be the appropriate

12  recommendation to this Court.

13          Of course, it will ultimately be up to the

14  Court to decide the final sentence, but I do join in with

15  the Government in the sense that that would be in the

16  range of what Mr. Cherouny got prior to any downward

17  departures.

18          THE COURT:  All right.

19          MR. SINCLAIR:  Now, you had mentioned some

20  of these prior sentencings, and I was present.

21          I did vent my spleen against Sun Trust in the

22  memorandum.  That doesn't -- I realize they're still a

23  victim, but there is a big bank here who profited greatly

1    from a lot of these loans whether they were induced by

2    fraud or just induced by very lax loan policies.

3            But I'm not going to go there.  It's just a

4    fact, though, that I hope the Court does consider.

5    Unfortunately, those officers above, who may have known

6    that these were loose loans, obviously were smart enough

7    to keep their fingerprints off the documents.

8            And perhaps it was willful blindness, because

9    we can't go any higher.  So, the -- you know, they picked

10   the lower fruit, so to speak, the loan officers who were

11   working for commissions and went astray.

12           But again, with all that in mind, Your Honor,

13   I would ask that the Court consider Mr. Siveroni's

14   letters.  He does have the first two rows of people here

15   (indicating).  They're all supporters.  And I would point

16   out that his father and mother-in-law from Roanoke are

17   here (indicating).

18           And I would ask the Court to consider all of

19   the background, the children, and that you give the

20   appropriate sentence.

21           THE COURT:  Thank you.

22           Mr. Siveroni, please come to the podium.  This

23   is your opportunity to tell me anything you'd like to;

16

1    then please stay at the podium for sentencing.

2                    THE DEFENDANT:   (Complied)

3                    Yes, Your Honor.   I'm going to keep this

4    brief.   I'm a little nervous, and I'm just going to read

5    this, if that's okay with the Court.

6                    I really want the Court and all in attendance

7    to know how remorseful I am for my actions and the effect

8    of those actions in this case.

9                    I understand that I acted in a wrong and

10   criminal way, and I had the ability to stop and prevent

11   many of the actions that led me to be in this position.

12   I could wrongly deny the strength of character to see how

13   wrong it actually was.

14                   Because of my actions Sun Trust was put in

15   harm's way and those near and dear to me have suffered

16   greatly, the people behind me especially, none more so

17   than my family, which is my number one priority.

18                   Your Honor, if there were any way to undo

19   this, I absolutely would.   I know that's not an option,

20   and I'm here before you now.

21                   That's it.

22                   THE COURT:   Well, I think you understand what

23   you did now.   Clearly, there's some indicia that Sun Trust

17

1   should bear some of this responsibility, and in a sense

2   you're correct and your family members are correct and Mr.

3   Sinclair is correct.

4           You know, this whole (inaudible) loan program

5   was a travesty.  It just opened up an avenue where fraud

6   could be perpetrated with impunity.

7           And where are the managers -- your wife, I

8   thought, had it -- and Mr. Greybeck (ph.) -- had it right

9   when they said where's the rest of the support staff,

10  looking the other way, getting a commission, why those

11  managers in place at Sun Trust Bank at the time haven't

12  been looked at.  Or maybe they have been.  Or, you know,

13  where are the underwriters?  They're all complicit in what

14  happened here, in what resulted in great harm to the

15  community.

16          But you -- you're the guy that made it

17  possible by going astray.  You've got a great family.

18  You've got folks that are law abiding and have contributed

19  tremendously to the community.

20          And, you know, when you talk to your family

21  members, your nephews and your nieces and others that you

22  talk to in the future about what happened here, I hope

23  that you'll stand up and say, "This ultimately was my

18

1    responsibility, and I made a mistake, and don't you make

2    the same mistake."

3           And Mr. Asonye has sat here and listened to me

4    for the last several months and looked carefully at the

5    people behind the crime committed through this loan fraud

6    scheme and found every person to be a genuinely good

7    person who had been a contributing member of the community

8    and had just lost their way.

9           And, you know, I'm sure that greed was a part

10   of it, and wanting to help out community members was part

11   of it, and to be successful was part of it.  And it's very

12   unfortunate for everybody -- and especially, as you

13   pointed out, your family.

14          Under the 3553 factors, I look at the crime,

15   and you are the most culpable of the persons.  I don't

16   really think that you led the others, in the sense of

17   leading them where they would not have gone, with the

18   exception of Ms. Camacho and Ms. Sanchez in the beginning.

19   The other loan officers did what they were going to do,

20   and you were not responsible for that.

21          In looking at deterrence and disparity of the

22   sentences of the other parties, I'm going to sentence you

23   to twenty-four months of incarceration and two years of

1    supervised release.

2              I'll not impose a fine and costs, as I find

3    you're unable to pay, given the restitution order.

4    There's a $100 special assessment.

5              As a special condition of your supervised

6    release, I'll order that you make any financial documents

7    the probation officer wants available to them.

8              I'll not order that you require substance

9    abuse testing and treatment because I've found it's not

10   necessary.  But the probation office can request it if

11   they believe that it is appropriate.

12             Is there any objection to self surrender for

13   Mr. Siveroni?

14             MR. ASONYE:  No objection, Your Honor.

15             THE COURT:  All right.  Thank you.

16             I'll allow you to self surrender when the

17   Bureau of Prisons contacts your probation officer --

18             MR. SINCLAIR:  Your Honor, could I recommend

19   Cumberland Camp, if possible?

20             THE COURT:  Cumberland?

21             MR. SINCLAIR:  They'll probably be the

22   closest.

23             THE COURT:  All right.  I'll recommend

1   Cumberland for your term of incarceration.

2              Anything else?

3              MR. SINCLAIR:  That's it, Your Honor.

4              THE COURT:  All right.

5              MR. SINCLAIR:  Thank you, Your Honor.

6              THE COURT:  Thank you, Counsel.

7                          *  *  *

8              (Whereupon, at approximately 10:45 o'clock

9    a.m., the hearing in the above-entitled matter was

10   concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

21

* * * * *

CERTIFICATE OF REPORTER


I, KATHLEEN M. ELIAS, a Certified Verbatim Reporter, do hereby certify that I took the stenographic notes of the foregoing proceedings which I thereafter reduced to typewriting; that the foregoing is a true record of said proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which these proceedings were held; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.


_____/s/_____
Kathleen M. Elias, CVR
Certified Verbatim Reporter